**NATIONAL REPERTORY THEATRE FOUNDATION, Appellant,**

v.

**FORD THEATRE SOCIETY.**

No. 71–1344.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1972.

Decided Oct. 10, 1972.

Mr. Bardyl Rifat Tirana, Washington, D. C., for appellant.

Mr. Paul Martin Wolff, Washington, D. C., with whom Mr. David N. Webster, Washington, D. C., was on the brief, for appellee.

Before WRIGHT, McGOWAN and WILKEY, Circuit Judges.

WILKEY, Circuit Judge.

We are called on here to construe a contract between the National Repertory Theatre Foundation (Foundation) and Ford's Theatre Society (Ford), whereby Ford agreed to reimburse the Foundation for producing a series of plays in Ford's theatre. Expenses incurred by the Foundation in producing the plays were to be assigned to one of five specified categories: "general and administrative," "subscription campaign," "production," "theatre break-in," and "operating." The contract specified maximum amounts to be paid under each of the five headings and established criteria for determining what types of expenses should be placed in each category.

In accordance with the procedure specified, at the end of the contract term the Foundation's accountants submitted for certification to Ford's accountants itemized lists of expenditures allegedly incurred under the contract. After examining this demand for payment, Ford's accountants determined that some of the expenditures did not fit within the definitions provided in the contract and advised Ford that it should

not pay them. The Foundation thereupon brought suit for the disputed expenses, alleging that under the contract its accountants [1] were authorized to make a final and binding determination of what expenses were payable by Ford. Ford denied this, alleging that under the terms of the contract its accountants were given the power to determine what expenses were chargeable to what category and were to be paid by Ford. After receiving testimony on what the parties intended under the contract, the District Court decided that Ford's accountants were to have the power to make a final determination.

We hold that by the unambiguous terms of the contract neither the accountants of Ford nor those of the Foundation were intended to have the authority to make a final determination of what amounts were payble under the agreement.

A brief description of the contract's structure and contents is necessary.[2] Paragraph 3 of the contract contains five subparagraphs—one subparagraph each defining and establishing criteria for allocating expenses into the five categories. The first subparagraph deals with "general and administrative" expenses, and states that these expenses are to be "defined in accordance with the accounting practice of [the Foundation's] accountants . . . ."[3] This language is omitted from the four remaining subparagraphs dealing with the other four categories of expenses, nor is there wording providing differently at this same place in the other four subparagraphs.[4] Language at the beginning of paragraph 3 implies that payment under *any* of the five categories will be "in the manner set forth in paragraph 5, after certification by . . . [Ford's accountants] according to *recognized accounting principles* . . . ."[5]

Paragraph 5 of the contract deals with the four categories of costs other than "general and administrative" costs; *i.e.,* the four categories that in paragraph three were not specifically described as to be "defined in accordance with the accounting practice of [the Foundation's] accountants . . . ." With regard to each of these four categories, paragraph 5 states that "[the Foundation] will submit for certification at the office of [Ford's] accountants *according to the definition[s] set forth in paragraph 3* . . . and general accounting principles, a summary schedule [of expenses] . . . ."[6]

Pointing to the difference between what Ford's accountants are to do under paragraph 3 and what they are to do under paragraph 5, Ford makes the following analysis. Ford concedes, with apparent magnanimity, that under the language of paragraph 3 the Foundation's accountants are to have absolute discretion as to what expenditures will be allocated to the "general and administrative" category.[7] The remaining four

---

1. The Foundation's accountants were recognized specialists in accounting for the theatre industry, a fact upon which the Foundation relies heavily in its interpretation of the contract. Under the analysis we make here this fact is of no decisive import, except that it in some degree cuts against the other party's (Ford's) accountants being set up as a "final arbiter" as to what were legitimate expenses and as to which category they belonged in this theatre venture.

2. The text of the contract is reproduced in the Joint Appendix, Vol. I, at 110–20.

3. Paragraph 3(a), Joint App., Vol. I, at 111.

4. Paragraph 3(b)–(e), Joint App., Vol. I, at 112–14.

5. Paragraph 3, Joint App., Vol. I, at 111 (emphasis added).

6. Emphasis added. The language cited in the text appears in each of the three subparagraphs of paragraph 5. These three subparagraphs deal with the four categories of expenses other than "general and administrative." Paragraph 5(a)–(c), Joint App., Vol. I, at 116–17.

7. Ford's graciousness in admitting that the Foundation's accountants were to be the final arbiters of what was payable under the "general and administrative" category

categories of expenses, however, are not to be "defined" by the Foundation's accountants. Rather, they are to be determined and paid according to the provisions of paragraph 5, which states that Ford's accountants are to "verify" the expenditures "according to the definitions set forth in paragraph 3 . . . ." Ford argues that this authority to "verify" the accounts according to the definitions of the four types of expenses means that Ford's accountants are to have the power to determine if payments are actually owing under the contract. In essence, Ford argues that its accountants' authority to "verify" the bills presented by the Foundation's accountants is synonymous with the power to act as a binding arbiter of what amounts are payable.

■■ Ford's analysis of the contract is correct in part. The language of paragraph 5 makes it crystal clear that the Foundation's accountants were *not* intended to be the final arbiters of what expenses must be paid by Ford.[8] It does not necessarily follow, however, that Ford's accountants are entitled to decide finally what expenses must be

---

is less than sheer generosity. Ford had already paid out the maximum amount payable under that category and could not have been called on to pay more, even if the Foundation's accountants "defined" additional expenses as being "general and administrative."

Ford's analysis that the Foundation's accountants would be the final arbiters of "general and administrative" expenses bolsters its argument that Ford's accountants were to be the final arbiters of all other expenses. If it is admitted that certain language in the contract provides that one set of accountants are the arbiters of "general and administrative" expenses, there develops a certain superficial logic favoring the argument that the other set of accountants are to be the arbiters of all other expenses.

This logic is based on the assumption that, if some of the expenses are to be determined by accountants, then all of the expenses are to be determined by accountants. Since paragraph 5 makes it clear that the Foundation's accountants are not to determine expenses other than "general and administrative," it would follow that Ford's accountants must have been intended to determine them.

It is unnecessary to decide whether the Foundation's accountants were intended to be the final arbiters of what were "general and administrative" expenses since none of the payments under that section are being contested here. We believe, however, that the Foundation's accountants were not intended to be the final arbiters of what were "general and administrative" expenses. Admittedly, paragraph 3 provided that the Foundation's accountants were to "define" the expenses payable under that subsection. This grant of authority was followed in the subparagraph, however, with a long description of *how* these expenses were to be defined. If the Foundation were to have had absolute discretion over what was to be paid under the "general and administrative" heading, the precise definitions given under that subsection would have been unnecessary. It is more logical to conclude that the power granted the Foundation's accountants to "define" what were "general and administrative" expenses was substantially similar to their duties under the other four categories of expenses.

8. The Foundation's argument that its accountants were to be the final arbiters of contract disputes was not actually based on the language of the contract. Rather, the Foundation's position rested on the testimony of various parties to the contract. They testified that their understanding had been that Ford's accountants were simply supposed to "check the arithmetic" of the expenditures submitted by the Foundation's accountants. *See* Appellant's Brief at 27–32. This testimony is irrelevant, since we find that the contract was unambiguous on its face and that it clearly did not provide for the Foundation's accountants to be the final arbiters of contract disputes.

In any case, this testimony relied on by appellant is not inconsistent with our reading of the contract. It may well have been that one of the primary reasons Ford insisted on having its own accounting firm review the Foundation's bills was to "check the arithmetic." This does not mean, however, that the contractors could not have granted an additional power to Ford's accountants, *i. e.*, the power to "verify" the expenditures "according to the definitions set forth in paragraph 3 . . . ." This additional power granted by paragraph 5 clearly indicates that Ford's accountants were not limited to checking arithmetic.

paid under the four categories enumerated in paragraph 5. Paragraph 5 merely requires Ford to pay "immediately" if the expenses submitted by the Foundation are "verified" by Ford's accountants.[9] It does not say, however, that in the final analysis Ford will be excused from paying demands if they are not "verified." Paragraph 5 no more makes Ford's accountants an arbiter of who must pay in conflicts between the parties than does paragraph 3 make the Foundation's accountants the arbiter.

A rather decisive argument against making either set of accountants a final arbiter under either the first or the last four categories is that it sets up a theoretical and practical conflict within the corners of the contract. If the Foundation's accountants have the power to determine what *is* "general and administrative" expenses under the first category, they have the power to determine what *is not* "general and administrative" expense. By parity of reasoning, if Ford's interpretation is accepted, Ford's accountants would have the same power of classification, in or out, for the last four categories.

The practical—and completely unacceptable—result is illustrated here. Two of the several types of expenses rejected by Ford's accountants are salaries of ticket takers and ushers at Ford's Theatre in Washington. The Foundation's accountants have said these are *not* "general and administrative" under category one (which appears to deal almost exclusively with expenses incurred at the Foundation office in New York City); Ford's accountants have said they do not fit within either of the last four categories, and have refused to "verify" them. There would appear to be nothing more obviously an expense of a theater production than ticket takers and ushers, yet the theory of accountants as final arbiters rules out its payment under *any* classification.

The truth is that in this, as in virtually every other business contract, the parties did not intend to set up any *accountants* as being the *final arbiters* of whether disputed amounts are due. We find no statement or suggestion anywhere in the contract that the parties intended to grant such an extraordinary power to their respective accountants. Indeed, the language and structure of the contract compels the conclusion that the parties expected their accountants to perform the type of service that accountants ordinarily perform for businessmen. The Foundation's accountants were supposed to prepare a list of expenses that they believed payable under the definitions provided in paragraph 3. Ford's accountants under paragraph 5 were supposed to check these proposed lists of expenses and contest any of them that they did not believe were covered under the contract. This is exactly what the two sets of accountants did in this case. Once an issue was raised by the accountants regarding whether an amount was due, it became a *legal* question whether the contested amount was actually due under the contract.

This legal issue must be resolved by the District Court just as any other dispute under a contract is adjudicated. Upon remand the court should develop evidence, either before the court or by reference to a special *master*, on whether the contested expenses do in fact fit under any of the definitions given in paragraph 3.

The decision of the District Court is vacated and the case is remanded for a determination of whether the disputed expenses are payable under the definitions provided in the contract.

So ordered.

---

9. The introductory portion of paragraph 5 reads as follows:

The amounts described in paragraph 3 in excess of advance payments described in paragraph 4 will be paid by [Ford] immediately after written certification by · . . . [Ford's accountants] . . . .

Paragraph 5, Joint App., Vol. I, at 116